On June 1, 1979 the court entered the following order:
Before Nichols, Judge, Presiding, Kunzig, and Bennett, Judges.
Plaintiffs’ quantum meruit claim for compensation for land transportation services in excess of those contemplated by their agreement with the Government is before this court on the parties’ stipulation of facts, and at their request, without oral argument. Because the issues before us here are so similar to those resolved in plaintiffs’ favor by our holding in Allstates Van Lines Corporation, et al. v. United States, 215 Ct.Cl. 1075 (1978), we find that the plaintiffs here are entitled to additional compensation in the stipulated amount of $17,072.01.
Plaintiffs agreed to provide land transportation on Code 5[1] household goods shipments between points in Korea and points in the United States. The parties have stipulated that the plaintiffs had full responsibility for routing and moving the shipments from their point of origin to a military ocean terminal at the point of embarkation from Korea. Ocean transportation was to be performed by the defendant to a military ocean terminal at the point of *682 debarkation, where the shipment was returned to the carrier for transportation to the final destination.
When plaintiffs in November 1970 filed rates covering transportation of shipments through November 1, 1971, two military ocean terminals were operating in Korea, one at Pusan and one at Inchon. The same two ports were still operating when rates were filed on July 16, 1971, to become effective on November 1 of that same year and remain effective until October 15, 1972.
After a study concluded that the Government could realize a cost-savings by closing the port at Inchon, the Commander of the Eighth United States Army directed that the port close on August 1, 1971. Plaintiffs were directed to use the remaining terminal at Pusan for all Code 5 shipments subsequently originating or terminating in Korea. At the time the port at Inchon was closed, plaintiffs already had filed with defendant rates effective to October 15, 1972. Thus, from August 1, 1971 until October 15,1972 (the earliest date at which new rates could become effective), plaintiffs were required to perform land transportation service in excess of that which they would have performed had there been two ports open instead of the single port of Pusan. For nearly 15 months, plaintiffs performed transportation services for the defendant according to their agreement, an agreement that was based on rates which when computed envisioned the continued use and existence of two ocean terminals in Korea.
Plaintiffs filed suit relying primarily on our holding in Allstates, supra. In that case, we allowed the plaintiffs to recover costs of additional land transportation incurred when defendant required all Code 5 shipments between points in the United States and points in Belgium and the Netherlands to be routed through the military ocean terminal at Bremerhaven, Germany. In requiring shipments through Bremerhaven, defendant refused to allow plaintiffs use of six terminal points in the Netherlands and four in Belgium, which were closer to the points of destination and origin involved and whose availability and use by plaintiffs was an underlying factor in their rate structure.
In an attempt to distinguish Allstates, supra, defendant contends that the closing of the terminal at Inchon was an *683 exercise of the sovereign powers of the United States for which the Government cannot be held liable in breach of contract or for a quantum meruit claim. Defendant argues that since the closing of the base was an exercise of sovereign power rather than a mere military directive like the one in Allstates, supra, plaintiffs are not entitled to additional compensation.
We agree with plaintiffs. No case has been brought to our attention that would warrant classifying as a sovereign act the closing of a military ocean terminal purely to effect cost savings. Such an action is more akin to the Government’s proprietary and commercial functions than it is an exercise of the sovereign powers of the United States that might excuse the Government from tendering further compensation.
The Allstates court recognized the basic unfairness that would arise from allowing the Government to require plaintiffs to ship goods overland to terminals other than those available for use when rates were filed. We stated:
If we were to accept defendant’s rationale as a basis for our decision, we would be affirming a procedure by which the Government could accept bids for shipments from points in Belgium and then order the carrier to transport the goods overland to Murmansk for shipment without offering additional compensation. Clearly such a procedure would be unacceptable. 215 Ct.Cl. at 1077.
Moreover, when the Government in Trans Ocean Van Service v. United States, 192 Ct.Cl. 75, 426 F. 2d 329 (1970), also required plaintiff to perform additional transportation of military household goods, we held that in so doing the Government "created an implied obligation ... to reimburse the plaintiff for the reasonable value of the extra service.” 192 Ct.Cl. at 111, 426 F. 2d at 348.
It is no less unfair for the Government in this case to accept bids for shipments in Korea and subsequently to eliminate one of the two ports available for such shipments, effectively ordering that all shipments move through the only remaining port while refusing additional compensation.
For these reasons, we agree with plaintiffs that they are entitled to additional compensation in the stipulated *684 amount of $17,072.01 for the additional services necessitated by the Government action.
it is hereby ordered, after consideration of the stipulated facts, briefs, and exhibits of the parties, that judgment be entered for the plaintiffs in the amount of $17,072.01

 Code 5 service is known as "Door-to-Door Container Surface-Government” service. In such service, carriers load household goods into specially designed carrier-owned containers at the origin residence, transport them to a point of embarkation, whereupon ocean movement overseas is accomplished by the Government’s Military Sealift Command. Carriers subsequently transport loaded containers from the point of debarkation to the destination residence.